2026 IL App (1st) 231386-U

SECOND DIVISION
May 26, 2026

No. 1-23-1386

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | 08 CR 21347 |
| | ) | |
| | ) | |
| SEBASTIAN RODRIGUEZ, | ) | Honorable |
| | ) | Neera Lall Walsh |
| Defendant-Appellant. | ) | Judge Presiding |

_____

JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*: Affirmed. Defendant's sentence of 45 years is not unconstitutional. Sentencing court properly considered relevant mitigating factors.

¶ 2    A jury convicted Sebastian Rodriguez of first-degree murder for the October 2008 shooting death of Sameere Conn. At the time of the shooting, Rodriguez was 15 years old; his victim was 13. The trial court sentenced him to 50 years in prison. As the case law concerning juvenile sentencing rapidly evolved, his case bounced between this court and our supreme court until we finally remanded this matter for a new sentencing hearing, the one before us now.

¶ 3    The trial court sentenced Rodriguez to 45 years in prison. He appeals, arguing that his sentence is unconstitutional, as he was given a *de facto* life sentence without a finding that he is

irredeemable. He also argues the court erred in its consideration of the mandatory factors applicable to juvenile sentencing. We disagree on both counts and affirm.

¶ 4                                    BACKGROUND

¶ 5     This is Rodriguez's third visit to this court, as Rodriguez mounted sentencing challenges while the legal landscape on juvenile sentencing evolved. The details of his case are laid out in the first two appellate opinions. See *People v. Rodriguez*, 2017 IL App (1st) 141379, *vacated by People v. Rodriguez*, No. 122467 (Jan. 18, 2018)); *People v. Rodriguez*, 2018 IL App (1st) 141379-B, *vacated by People v. Rodriguez*, No. 123769 (March 25, 2020). We summarize only the facts necessary to address the issues in this appeal.

¶ 6     The State charged Rodriguez with first-degree murder in connection with the shooting death of Sameere Conn on October 1, 2008. At the time of the shooting, Rodriguez was 15 years old, but due to the law at the time, he was automatically transferred to adult criminal court, where he was tried, convicted, and sentenced.

¶ 7     In 2008, Rodriguez and Conn went to the same school together and had a dispute. A group of boys at the school had attacked Rodriguez once because of his Mexican heritage. Conn was a part of the group but did not participate in the attack. Before the shooting, one of their classmates, Kionte Lilly, spoke with the two of them in a three-way phone call, during which Rodriguez told Conn that he was on a "death list."

¶ 8     Another one of Conn's friends, Mario Martinez, testified that a month before the shooting, Rodriguez told him that he was going to kill Conn. The night of the shooting, Rodriguez drove to Martinez's house, asked Martinez if he wanted to take a ride, and showed him a gun wrapped in a sweater. Martinez declined the offer and went back inside.

¶ 9     Meanwhile, Conn and a group of friends, on their way home after attending a football

game, stopped at Hooks Finer Foods, a local grocery store. While some of the boys, including Conn, went inside, a few stayed outside. A man they later identified as Rodriguez, whom they knew from school and regularly saw in the neighborhood, approached the storefront, pulled a gun out of his hooded sweatshirt, and fired into the store. Conn, who was standing in the front of the store waiting to buy some things, was shot multiple times through a window and died.

¶ 10   Police later searched Rodriguez's home and recovered a revolver. An Illinois State Police firearms and tool marks examiner later connected one of the bullets recovered from the scene of the shooting to that revolver. Forensic testing of swabs taken from Rodriguez's hand also tested positive for gunshot residue chemicals, though an expert testified that the test results were not conclusive enough to say that Rodriguez had most likely fired a gun.

¶ 11   A jury found Rodriguez guilty of first-degree murder and made a special finding that he had personally discharged a firearm that proximately caused Conn's death.

¶ 12   In his first sentencing hearing, the trial court recognized that Rodriguez was only 15 at the time of the offense but characterized the crime as "completely senseless," "absolutely ridiculous," and "an absolute waste of human life," before imposing a 50-year sentence.

¶ 13   In his first appeal, Rodriguez argued, among other things, that his 50-year sentence was an unconstitutional sentence under *Miller v. Alabama*, 567 U.S. 460, 479 (2012), which forbids a mandatory life sentence for juveniles without the possibility of parole, and that a 2016 amendment to the automatic-transfer statute should apply retroactively to him. Between those arguments, primarily the attempt by Illinois reviewing courts to apply *Miller* to a myriad of different procedural postures and constitutional claims, this case bobbed up and down between the appellate and supreme court. It ultimately became clear that Rodriguez's 50-year sentence exceeded the threshold for what Illinois considered a "life" sentence under *Miller*, see *People v.*

*Buffer*, 2019 IL 122327, ¶ 41, and the case was remanded for re-sentencing.

¶ 14    That brings us to the present. Back in the circuit court, Rodriguez hired a new attorney to represent him at the new sentencing hearing. An updated pre-sentence investigation (PSI) report detailed Rodriguez's struggles in childhood. The report noted that Rodriguez had no criminal history, and that he told the investigator who prepared the report that he was "innocent and did not commit this crime." He maintained that he was not mature when Conn was shot and killed, that he regretted what happened to Conn's family and his own, but he insisted he was innocent. Rodriguez also filed a comprehensive sentencing memorandum, discussing the relevant mitigating statutory factors that he believed applied to his case. He highlighted his young age at the time of the shooting.

¶ 15    At re-sentencing, the court made extensive findings and observations. The court recognized that, though Rodriguez had been convicted of both first-degree murder and personally discharging a firearm, it had discretion to impose the firearm enhancement. That gave the court a sentencing range from 20 years in prison to natural life.

¶ 16    Though the trial had been several years earlier, the court remembered the facts of the case. The court noted the disagreement between Rodriguez, who was 15, and Conn, the 13-year-old victim. The incident that sparked the argument between them occurred about a month before Conn was shot and killed, the court recalled, meaning the "defendant had plenty of opportunities to think about it, plan it, and also recover a gun." Rodriguez "made a decision, a deadly decision. He drove himself, he found the victim, who was returning I believe from football practice, and was going to a store, and that victim, when he was exiting that store or entering possibly *** inside of that store, that [Rodriguez] gunned him down *** Those were deliberate actions."

¶ 17    The court then considered a list of enumerated factors, one-by-one, that it was required to

consider before sentencing. See 730 ILCS 5/5-4.5-110 (West 2024). The court considered Rodriguez's age but found no indication he was unusually immature or had any other learning or developmental issues. The court addressed whether peer pressure, family pressure, or other negative influences impacted Rodriguez: "There is no indication from anything that happened during the trial or in any of his presentence investigation or any of the materials that have been tendered to the court that it was his family or anybody who had undue influence on him. ***

[T]he Court is cognizant of the fact that he indicated that he was a Latin street gang member and that he was affiliated with a gang from 13 to 22. *** He talked in particular about the fact that he described his childhood being difficult *** that his parents were both involved in a gang."

¶ 18    The court also acknowledged receiving "quite a few letters on behalf of the defendant, and many are from people who have sought to counsel him and family members or friends of the family that have talked about how they think that he was a good person[.]" On the other hand, the court noted that Rodriguez had maintained his innocence, so the court could not consider his remorse in mitigation.

¶ 19    That brought the court back to the facts of the murder, which was "planned," as Rodriguez "tracked this victim down. He found him on the street walking back from a sporting event, and shot him in front of many. His actions were not a spur of the moment, impulsive act you would expect from a young mind, and as terrible as it sounds, it was planned. It was thought out. It was deliberate, and we know this by his words and actions."

¶ 20    Before announcing sentence, the court noted that Rodriguez would be eligible for parole after serving 20 years of his sentence. See *id*. § 5-4.5-115.

¶ 21    The court sentenced Rodriguez to a total of 45 years in prison, 20 years for the first-degree murder charge plus 25 years with the firearm enhancement. The court noted that "this

defendant is not receiving a life sentence based on the new parole statute[.]"

¶ 22    Rodriguez timely moved to reconsider his sentence, which apparently fell through the cracks and was not heard. A few months later, Rodriguez filed a late notice of appeal with this court, which we allowed. By agreement of the parties, we remanded this matter to the circuit court for a hearing on the post-trial motion. The circuit court denied it. Rodriguez now appeals.

¶ 23                                    ANALYSIS

¶ 24    On appeal, Rodriguez challenges his 45-year sentence in two ways. First, he raises a straight *Miller* challenge: he was sentenced to a *de facto* life sentence without an adequate consideration of his youth and its attendant characteristics. The fact that he is entitled to a parole hearing after serving 20 years is of no consequence, he says, because that parole hearing does not provide him a meaningful opportunity for release. *Miller* aside, he claims the trial court did not properly weigh one of the required mitigating factors, requiring remand for a new hearing.

¶ 25    At the outset, we note several legislative changes in recent years regarding juvenile sentencing, largely in response to the evolving case law since *Miller*. First, the court must consider 12 statutory factors in mitigation concerning the juvenile's youth and its attendant characteristics. See 730 ILCS 5/5-4.5-105(a) (West 2022). "This list is taken from and is consistent with *Miller*'s discussion of a juvenile defendant's youth and its attendant characteristics." *Buffer*, 2019 IL 122327, ¶ 36.

¶ 26    Second, a court sentencing a juvenile has discretion *not* to impose certain sentencing enhancements (like the 25-year add-on for personally discharging a firearm during the underlying crime) that would otherwise be mandatory for an adult. 730 ILCS 5/5-4.5-105(e) (West 2022). And third, a juvenile like Rodriguez, who is sentenced after June 1, 2019, may apply for parole and early release after serving 20 years of his sentence. *Id*. § 5-4.5-115.

¶ 27    With all this in mind, we examine Rodriguez's individual claims.

¶ 28                              I. *Miller* Challenge

¶ 29    Rodriguez first argues that his 45-year sentence is unconstitutional under *Miller*, as he was subjected to a *de facto* life sentence, but the record does not show that he is beyond rehabilitation. The State notes several flaws in this argument. We will focus on the most obvious: Rodriguez's sentence was discretionary, not mandatory.

¶ 30    *Miller* only prohibits life sentences that are *mandatory*—sentences where the court was robbed of any discretion to downwardly depart based on the defendant's youth and its attendant characteristics. See *Jones v. Mississippi*, 593 U.S. 98, 106 (2021) (*Miller* "allowed life-without-parole sentences for defendants who committed homicide when they were under 18, but only so long as the sentence is not mandatory—that is, only so long as the sentencer has discretion to 'consider the mitigating qualities of youth' and impose a lesser punishment."); *People v. Moore*, 2023 IL 126461, ¶ 38 (" '*Miller* did not prohibit life sentences for juveniles but, instead, held that the eighth amendment required sentencing courts to have discretion in sentencing juveniles after considering the juvenile's youth and the attendant characteristics of youth.' " (quoting *People v. Clark*, 2023 IL 127273, ¶ 54)).

¶ 31    It is undisputed that the court here had discretion in re-sentencing Rodriguez. The court could have declined to impose the firearm enhancement and sentenced Rodriguez to as little as 20 years in prison. And the court's sentencing was guided by the 12 statutory factors that our supreme court has blessed as "consistent with *Miller*'s discussion of a juvenile defendant's youth and its attendant characteristics." *Buffer*, 2019 IL 122327, ¶ 36.

¶ 32    None of this was lost on the trial court, which recognized that it could impose a sentence as low as 20 years. Whether the court properly exercised its discretion is a question we will take

up in a moment. What matters here is that the court was not *required* to sentence Rodriguez to more than 40 years. So his *Miller* claim fails for that reason alone.

¶ 33                    II. Consideration of Relevant Sentencing Factors

¶ 34    Rodriguez next claims the court improperly considered the second of the 12 mandatory factors a court must consider in sentencing a juvenile—whether Rodriguez "was subjected to outside pressure, including peer pressure, familial pressure, or negative influence." 730 ILCS 5/5-4.5-105(a)(2) (2021). He says the court did not adequately account for the fact that both his parents and siblings were gang-affiliated and encouraged him to affiliate, too. This pressure, says Rodriguez, "narrowed his worldview and steered him toward crime and violence."

¶ 35    Rodriguez does not deny that the court discussed his childhood influences; he says the court did not *properly* consider them. He isolates this observation by the court:

> "As to point number two, whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences. So at this point, he's the one who felt he had been wronged in this school situation in the hallway. There is no indication from anything that happened during the trial or in any of his presentence investigation or any of the materials that have been tendered to the Court that it was his family or anybody who had undue influence on him."

¶ 36    In other words, the court was saying, there is no evidence that anyone coerced Rodriguez into shooting Sameere Conn; he did it of his own accord. Rodriguez argues that the court interpreted the second factor too narrowly, that the factor is not necessarily concerned with peer pressure *to commit the crime at issue* so much as it speaks more generally to the negative influences in an offender's life that steer him or her to crime and violence.

¶ 37    It's likely both things. Surely this second factor *includes* the literal interpretation the

circuit court ascribed it. If a juvenile offender were urged by others to commit a murder, of course we would expect and want the trial court to consider that fact. And the court found that this was not the case here.

¶ 38　We don't disagree that this factor also calls for a more generalized review of the people influencing the juvenile offender. But here those negative influences were familial, and the third mandatory factor encompasses this point at least to some extent as well, requiring the court to consider "the person's family, home environment, educational and social background, including any history of parental neglect, domestic or sexual violence, sexual exploitation, physical abuse, or other childhood trauma including adverse childhood experiences." *Id*. § 5-4.5-105(a)(3).

¶ 39　The court did discuss Rodriguez's family and their gang affiliation and noted the overlap in this case between factors (2) and (3):

> "In reference to his family, he did speak about his family members. He talked in particular about the fact that he described his childhood as being difficult, and he reported that his dad was not consistently involved, and—but I will note at the time of this incident, my recollection of the facts were that he was, at that time, residing there, and that is, in fact, where the gun was found, too, and that he reported he had not been abused or neglected. He did make some references about his mother, that his parents were both involved in a gang, and he denied that there was any substance abuse issues in the home. He spoke about his mother, about not being the subject of any abuse, but that his mother was abused by boyfriends and that there was no physical abuse at home. However, in the presentence investigation, the mother disputes that and says she was not abused by any boyfriends and that there was not any physical abuse there. And so that goes also to point three, the person's family and home environment, educational and social background,

including any history of parental neglect, physical abuse, or other childhood trauma."

¶ 40    We thus cannot agree with Rodriguez that the court did not consider the fact that he was subjected to a difficult home environment and negative influences, including having a family with gang affiliations. He may not like the extent to which the court was or was not persuaded by these factors, but that is altogether different from claiming that the court failed to adequately consider them. The court clearly did. We have no basis to disturb the sentence imposed here.

¶ 41                                      CONCLUSION

¶ 42    The judgment of the circuit court is affirmed.

¶ 43    Affirmed.